RENDERED: JUNE 5, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1479-MR

LORRAINE WILSON　　　　　　　　　　　　　　　　　　APPELLANT

v.

APPEAL FROM KENTON CIRCUIT COURT
HONORABLE MARY K. MOLLOY, JUDGE
ACTION NO. 23-CR-01300

COMMONWEALTH OF KENTUCKY　　　　　　　　　　　　APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND CETRULO, JUDGES.

CALDWELL, JUDGE: Lorraine Wilson ("Wilson") appeals her conviction for falsely reporting an incident in the first degree. We affirm.

## BACKGROUND

In December of 2023, a Kenton County grand jury indicted Wilson for falsely reporting an incident in the first degree, disorderly conduct in the second degree, and menacing.

The charges related to a 911 call Wilson had placed on October 16, 2023. The day prior, Wilson's daughter, Kimberly Payne, had moved some of her furniture and belongings into Wilson's apartment located in the River's Edge at Eastside Pointe apartment complex in Covington, Kentucky. On the following day, Wilson told Payne she could not live in her apartment. Subsequently, the two had a disagreement while they were at a U-Haul store and Wilson left Payne there. Payne called her aunt, Carolyn Wilson ("Carolyn"), and asked her to pick her up. Carolyn, who is Wilson's sister, left work early from her job as a school security guard to do as Payne asked.

Shortly thereafter, Carolyn contacted her nephew, William Wilson ("William"), and her niece, Fatima Beamon, to assist in moving Payne's belongings from Wilson's apartment to storage. Sometime after their arrival at Wilson's apartment, Wilson placed a 911 call. During that call, after Wilson identified herself, she told the operator that her sister Carolyn had threatened her life with a gun. She also claimed other members of her family had encouraged Carolyn to shoot her.

Police officers arrived at the scene while Wilson was still connected on the 911 call. After detaining Carolyn and Payne at gun point, investigating officers questioned witnesses and searched for a firearm. The investigating officers on the scene eventually concluded that Wilson's allegation that Carolyn

-2-

had threatened her with a handgun was untrue. Wilson was arrested for false report which generates an emergency response.[1]

Several months after Wilson's indictment, a two-day jury trial took place in Kenton Circuit Court ("the trial court") in September of 2024. Prior to the start of the jury trial, the trial court dismissed the disorderly conduct charge upon the Commonwealth's motion. During the trial, the Commonwealth called three police officers who responded on the evening in question, as well as the assistant director of administration for the Kenton County Emergency Communications Center. In addition to the government officials, the Commonwealth also called William, Payne, and Carolyn as witnesses. Wilson testified in her own defense and was the sole defense witness called.

During the testimony of David Leonard, the assistant director of administration for the Kenton County Emergency Communications Center, a recording of the 911 call that Wilson placed was made an exhibit and played for the jury. Video Record ("VR"): 9/17/24, 1:24:00-1:28:40. In the call, Wilson told the 911 operator that her sister Carolyn had a pulled a gun while in her home and threatened to "shoot [her] brains out." *Id*. Wilson reported that her niece and nephew were also in her home and had encouraged Carolyn to "shoot her, shoot

---

[1] Carolyn was also arrested for disorderly conduct at the scene. The charge was eventually diverted and dismissed.

-3-

her." *Id.* Wilson told the 911 operator that Carolyn was an ex-police officer, but Wilson also said that she had gotten Carolyn fired from the job. Wilson mentioned that her daughter was outside as well but reported that all of the family members were now attempting to "run away" and expressed that she wished the police would hurry up.

Wilson was still connected on the 911 call as the first responding police arrived. The recording captured the sounds of emergency sirens as arriving police cruisers and police commanded to Carolyn to "show your [expletive] hands!" and to get on the ground. VR: 9/17/24, 1:26:50. At that point in the recording, Wilson could be heard exclaiming "Right on!" and shouting to the arriving police, "She's got a gun—a .38 Special!" *Id.* Bodycam of responding officers that the jury would later see showed the officers had their guns drawn on Carolyn during this time. VR: 9/17/24, 3:36:35.

After the testimony of Mr. Leonard, Wilson's nephew, William, a long-haul truck driver, was called to testify. He recalled that, on the date in question, he had gone to Wilson's residence to help with moving furniture from Wilson's residence that belonged to his cousin, Payne. William testified that his understanding at the time was that his assistance was needed as his aunt, Wilson, wanted Payne out of her apartment following a quarrel between the two. He testified that his aunt Carolyn and his younger sister, Beamon, were also present to

help move Payne's belongings. William described taking a load of furniture outside and rearranging the load in the back of his pickup truck. He testified that, as he returned to the apartment for another load after this, he saw Wilson with a knife, threatening to kill Beamon with it. He testified that he began to get between the two to stop Wilson from being able to harm his sister before Carolyn had managed to disarm Wilson and to stop any further escalation of the situation.

William testified that next, he began to drive his truck toward a storage unit to drop off the load. However, after seeing police cruisers with emergency lights going toward Wilson's apartment, he turned around and drove back. He testified that upon his return, he saw multiple police with guns drawn upon Carolyn as he arrived back on the scene.

Following William's testimony, Wilson's daughter Payne was called by the Commonwealth. Payne testified that she had left her job in Plano, Texas to move in with her mother after Wilson told her she was ill and dying and needed her help. Payne testified that she had moved in her belongings and stayed one night in her mother's apartment before Wilson asked her for money. She testified that once she refused this request, her mother became angry and demanded that she leave. Payne testified that after this altercation, she and her mother had gone to a U-Haul store. There, she said, her mother became angrier and suddenly left her there.

Payne testified that she was stranded at the U-Haul store and called her aunt, Carolyn, and asked her to come pick her up. After her aunt came to get her, Payne said that she told Carolyn that her mother had been threatening to kill her after she refused her request for money. She testified that Carolyn drove her back to her mother's apartment in order to move out her belongings but insisted that she remain in the car because of her mother's threats against her. Payne described Carolyn as attempting to deescalate the situation and move her belongings from her mother's apartment without further incident. She said that she had never seen Carolyn with a gun or holster on her person at any time on that day. Payne testified that, while she was waiting for family members to finish loading her belongings, she was confronted suddenly by police who had guns drawn on her and demanded that she get out of the car. She said that she had no idea what was going on and was forced to the ground and handcuffed at gunpoint. Payne became emotional as she recalled her fear at seeing guns pointed at her head and described begging the officers not to kill her.

After Payne's testimony, Wilson's sister Carolyn was called to the stand. Carolyn testified that she was a former officer with the Cincinnati Police Department and had retired as a sergeant after 30 years of service with the department. She testified that, contrary to Wilson's claim on the 911 call, she was never fired from her job with the police department and had retired in good

standing. She said that she was currently employed by the Cincinnati public school system as a security officer. Carolyn testified that she had a firearm that she carried while on duty at her security job. However, she testified that she always put the gun in the trunk of her car when she was finished working and secured it in a lockbox there that was issued to her upon her retirement from the police department. Carolyn denied having the gun on her person at any time while she was in her sister's apartment on the date in question and testified that she had never brandished or pointed a gun at her sister.

Carolyn testified that she did not realize that her niece had moved back to Covington from Texas before she received the phone call from Payne requesting her help after being stranded at a U-Haul store. She testified that she had recruited her nephew and niece to assist with moving Payne's belongings from Wilson's apartment to a storage unit. After arriving at her sister's apartment, Carolyn said that she had told Payne to remain in her car because Carolyn's sister (Wilson) and her niece (Payne) had a bad relationship.

When describing the situation at her sister's apartment upon her arrival, Carolyn testified that Wilson was immediately aggressive and was cursing and calling her and her family members foul names. Carolyn testified that her niece, Beamon, became angry at the names Wilson was calling her and an argument between the two took place. Following this, she said that Wilson

grabbed a knife from her kitchen counter and threatened Beamon with it while approaching her. Carolyn described getting between Wilson and Beamon and taking the knife from her sister and telling her nephew, William, to take Beamon out of the apartment. Carolyn testified that Wilson's behavior had upset her so much that she told her sister that she was going to take her name off of her lease and no longer serve as her power of attorney.[2]

After this, Carolyn testified, she exited Wilson's apartment to wait outside while waiting for William and Beamon to return for the next load. As she was waiting, she saw a light that she recognized as a police spotlight. Presuming that someone had called police about the incident with the knife, Carolyn testified, she waved the police toward her. She described being shocked when she realized that the police had guns drawn on her and heard their demands to get on the ground. She testified that she was unable to get to the ground quickly because she had a bad hip. She described being more frightened by the multiple guns pointed at her than in any experience in her thirty years as a police officer.

On cross-examination, Carolyn testified that the police had requested to search her car trunk and that she had declined to consent. She testified that she

---

[2] Carolyn testified that she had previously agreed to be Wilson's power of attorney and to sign on to the lease for Wilson's apartment.

told the investigating officers to get security footage from the apartment complex to verify her account of the events that day.

Three police officers who responded to the scene testified after the members of Wilson's family. Officer Sean Sinacori (Sinacori) testified that he was the first responding officer on the scene and that he had detained Carolyn. Video recording of his arrival on the scene was captured by a bodycam he wore while on duty; the footage was played for the jury during his testimony. Officer Sinacori testified that he drew his firearm after Carolyn had been slow to respond to his demands because she had put her hands in her pockets and said no and "bladed her body." VR: 09/17/24, 03:31:27; 03:32:05. He testified that he performed a pat-down after Carolyn was arrested and placed in handcuffs. He said that he found no weapons on Carolyn.

At the close of Officer Sinacori's testimony, the jury sent a note with several proposed questions for the witness. Three of the questions were inquiries about the tactics used when detaining Carolyn and were not posited to the witness after the trial judge determined these questions were irrelevant to the matters for jury determination. Two of these questions concerned the drawing of firearms and another was about Officer Sinacori's use of expletives while demanding Carolyn get on the ground.

Covington Police Detective John Murphy testified that he was dispatched to the scene on a high priority call. He testified that while he was en route to the apartment complex following the dispatch, the first officers to arrive on scene were not responding to their radio and he feared they were involved in a gun fight. Detective Murphy described this creating a high-stress and volatile situation. After he arrived, he learned that other officers had determined there was no active threat at that time. He described assisting with the search for a firearm and stated that no gun was located.

Specialist Kody Crank of the Covington Police testified that he was also dispatched to the scene as a result of the 911 call. He testified that indications of an incident involving a gun, violent threats, as well as the involvement of an ex-police officer who had allegedly been fired, were all factors from that report that resulted in the call response being designated as high priority. He testified that this designation prompted an elevated police response. Per department policy, he testified, a high priority dispatch prompted the response of nearly all on-duty officers in the department and utilization of a tactical approach reserved for violent or escalating situations upon their arrival. Specialist Crank testified that an indication in a report of an ex-police officer who had been fired making threats with a gun resulted in a heightened response for reasons including the assumed training in weapons such a suspect would have.

-10-

Specialist Crank testified he had arrived at the scene at about the same time as Officer Sinacori and had assisted in detaining Carolyn. He testified that he had searched for a firearm but did not locate one or see any holster. After Carolyn told him that she had a gun in her trunk but would not consent to a search, he testified that he concluded he could not search the trunk of her vehicle. Specialist Crank questioned Wilson at the scene and bodycam footage of the interactions was played during his testimony. He testified that he became suspicious of Wilson's account after she offered inconsistent descriptions of the gun and whether it had actually been pointed at her. After further questioning of witnesses, Specialist Crank concluded that their stories matched Carolyn's account of the events rather than Wilson's. Eventually, he placed Wilson under arrest for falsely reporting an incident.

At the close of the Commonwealth's proof, Wilson moved for a directed verdict, arguing that the Commonwealth had failed to establish that her report during the 911 call that Carolyn had threatened her with a gun was false. The trial court denied the motion.

Wilson testified as the only witness called by the defense. Wilson denied that she had threatened Beamon with a knife or that she had been the aggressor during any of the conflicts with her family members. She testified that she had made the 911 call because Carolyn had threatened her with a gun. During

her testimony, Wilson conceded she had made false assertions in at least one statement she made during the 911 call. During the call, Wilson said to the 911 operator, "[t]hey know I'll kill them. I went to the penitentiary once for killing, I'll go back [expletive] [again]." When asked about this statement, Wilson testified that she had never gone to prison for killing anyone and that she would not have harmed any members of her family. She contended that she had said this because she was angry and so that the police would respond more quickly.

After the defense rested, Wilson renewed her motion for a directed verdict. She argued that her testimony had confirmed that she had been threatened with a gun and had called the police because she feared for her life and safety. The trial court denied her renewed motion.

The jury was instructed on the charge of falsely reporting an incident as follows:

### Instruction 5

You will find the Defendant, Lorraine G. Wilson, guilty of Falsely Reporting an Incident which Lead to an Emergency Response under this Instruction and Count 1 of the Indictment if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

A. That in this county on or about October 17, 2023, and before the finding of the Indictment herein, she reported to the Kenton Dispatch Center in her 911 call that Carolyn Wilson threatened her with a firearm;

-12-

B. That she knew the information was false;

C. The false alarm resulted in an emergency response of at least two first responders.

AND

D. Under the circumstances, the public safety was or could have been jeopardized.

Record on Appeal ("R.") at 79.

In closing arguments, defense counsel argued that, in the approximately three minutes between Wilson dialing 911 and the arrival of the first responding officers, Wilson's family members had concocted a story as to the events that day and Carolyn had hastily hidden her firearm. The defense further argued that, had the police looked in the trunk of Carolyn's car, they would have confirmed this by finding her gun there in her holster but outside of the lockbox.

During deliberations, the jury sent out a note to the trial court inquiring about this instruction. The note began with a reference to the phrase "that she knew <u>THE</u> information was false" located in subsection B of Instruction 5 (emphasis in jury note). Following this, the note contained the question: "[d]oes the word 'the' refer to the gun as stated in part A OR does 'the' refer to all information/details in the 911 recording?"

Counsel for both parties argued before the trial court as to the most appropriate response to note from the jury. Eventually, both counsel and the trial

court agreed that the following reply would be added to the jury's note:  "'the information' is to be determined from the evidence heard in the case."  The trial judge and counsel for both parties signed the reply.

After deliberations, the jury found Wilson guilty of falsely reporting an incident and recommended the minimum sentence of one year.[3]  The jury found Wilson not guilty of menacing.

The trial court sentenced Wilson to one year of home incarceration and to attend and successfully complete an anger management course.

This direct appeal follows.  Wilson contends the trial court erred in denying her motion for a directed verdict.

## STANDARD OF REVIEW

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth.  If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given.  To ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

---

[3] Violation of Kentucky Revised Statutes ("KRS") 519.040(1)(a) is a Class D felony pursuant to KRS 519.040(2)(b).

On appellate review of the directed verdict decision of a trial court, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

**ANALYSIS**

Wilson appeals on a single issue, whether the trial court erred in denying her motion for a directed verdict.

To convict Wilson of falsely reporting an incident under KRS 519.040(1)(a), the Commonwealth was required to establish that Wilson "[k]nowingly cause[d] a false alarm of fire or other emergency to be transmitted to or within any organization, official or volunteer, that deals with emergencies involving danger to life or property, and the false report result[ed] in an emergency response[.]"

Wilson does not dispute that her 911 call caused the transmission of an emergency alarm or that an emergency response resulted. However, Wilson argues that the Commonwealth failed to establish that Wilson's report that Carolyn had threatened her with a firearm was false. She contends that there was a complete failure of proof as to this element. The relevant issue on appeal then, is whether, under the evidence as a whole, there was sufficient evidence to induce a

-15-

reasonable juror to believe beyond a reasonable doubt that Wilson caused a *false* alarm of emergency.

At trial, defense counsel argued that "all [the police] had to do was look [in the trunk] to see whether it's true that [the gun] was in a holster or whether it was true that it was in a lockbox." VR: 09/18/24, 09:19:30. On appeal, Wilson resuscitates this argument to contend that the failure to search Carolyn's trunk was indicative of a complete failure by police to conduct a meaningful investigation. She contends that, rather than investigate her own report of being threatened with a firearm, the police simply "made a decision to believe Carolyn over [Wilson] on scene, when Carolyn asked them to give her the benefit of the doubt as a former officer." Appellant brief, p. 17.

As she argued to the jury, Wilson points out to this Court that the Commonwealth's witnesses conceded that they never inspected the trunk of Carolyn's car. Had the police done so, she asserts, they would have found the firearm lying in the trunk outside of the lockbox. Discovery of this evidence, she asserts, would have established that Carolyn had hastily placed her firearm and holster in the trunk between the time Wilson placed the 911 call and the arrival of the first responding officers. She argues that the trial court should have recognized the insufficiency of the Commonwealth's evidence and granted her directed verdict motion(s).

The Commonwealth argues that the trial court properly denied Wilson's motions and asserts that there was more than sufficient evidence presented to establish that Wilson's report was false. It argues that police officers testified as to an investigation that indicated that, contrary to Wilson's initial claims, Carolyn did not have a firearm or a holster on her when they arrived. In addition to the testimony of the officers, the Commonwealth asserts that bodycam footage viewed by the jury showed that Wilson made inconsistent statements concerning her allegations to the responding officers. While she initially told responding officers that Carolyn had pointed a gun at her, the Commonwealth argues, later in the bodycam videos she amended her story to allege that Carolyn had lifted a gun from a holster on her waistline rather than pointing it directly toward Wilson's person. The Commonwealth argues that, when asked to describe the gun she saw Carolyn brandish, Wilson gave descriptions that conflicted with her initial claims. To the initial responding officers, while still connected to the 911 call, Wilson said that Carolyn had a .38 Special. A short time later, Wilson told Specialist Crank that it was a black gun like the semi-automatic handguns the officers at the scene were carrying.

The Commonwealth points out that the jury heard testimony from Specialist Crank that a .38 Special was a revolver that had not been regularly carried by police for decades and that it had a distinct appearance in contrast with

the service weapons in current use. The officer cited to this conflict in Wilson's account as a factor in his conclusion that Carolyn had not brandished a firearm, the Commonwealth argues.

The Appellee brief points out that several witnesses testified that Wilson's claims on the 911 call which prompted the emergency response were false. Carolyn testified that her gun remained in the lockbox in her trunk for the entire period in question and that she never brandished a gun while at Wilson's residence, which was corroborated by other witnesses. She testified that no one gave Wilson reason to fear for her safety; rather, she asserted that Wilson threatened and approached her niece, Beamon, with a knife. Wilson's nephew, William, testified that he also saw Wilson threaten Beamon with the knife and contended Carolyn's actions consisted only of attempts to resolve the conflict. He unequivocally testified that he never saw Carolyn with a gun or a holster, and never saw her point a gun at Wilson. Wilson's daughter, Payne, testified that she had never seen Carolyn with a gun or holster on her person at any time while they were at Wilson's residence.

Wilson filed no Reply brief. However, where she acknowledges the testimony of her family members in her Appellant brief, she criticizes their credibility and points to instances of their testimony she alleges are inconsistent with one another or with the bodycam footage. We agree with the Commonwealth

that Wilson's argument in this regard is misplaced in this appeal from the denial of a directed verdict motion.

To assess the trial court's denial of Wilson's motion for a directed verdict, this Court is confined to consideration of "the decision of the trial judge in light of the proof presented." *Benham*, 816 S.W.2d at 187. To carry out this function, we must recognize that the trial court was required to "assume that evidence for the Commonwealth is true, but reserving to [the] jury questions as to the credibility and weight to be given to such testimony." *Goncalves v. Commonwealth*, 404 S.W.3d 180, 206 (Ky. 2013) (quoting *Benham*, 816 S.W.2d at 187 (Ky. 1991)); *see also Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) (citing *Commonwealth v. Jones*, 880 S.W.2d 544 (Ky. 1994)) ("On review, the appellate court should not reevaluate the evidence or substitute its judgment of the credibility of the witnesses for that of the jury.").

Any inconsistencies in the statements of Wilson's family members go to the weight of their testimony. *Goncalves*, 404 S.W.3d at 206. And both "[t]he credibility and the weight to be given the testimony are questions for the jury *exclusively*." *Sawhill v. Commonwealth*, 660 S.W.2d 3, 5 (Ky. 1983) (emphasis added).

Given the testimony of Wilson's family members and the responding officers, along with the recordings of the 911 call and bodycam footage that were

-19-

played for the jury, viewed as a whole, we cannot say it would be clearly unreasonable for a jury to find Wilson guilty of falsely reporting an incident. *Benham*, 816 S.W.2d at 187. When viewed in the light most favorable to the Commonwealth, this evidence was sufficient to induce a reasonable juror to believe beyond a reasonable doubt that Wilson was guilty of violating KRS 519.040(1)(a). Pursuant to the long-standing test set forth in *Benham*, we cannot say the trial court improperly denied Wilson's directed-verdict motion. 816 S.W.2d at 187. Next, we address Wilson's argument about jury instructions and jury inquiries and their effect on resolving the directed verdict motion.

### JURY INSTRUCTIONS AND JURY INQUIRIES

Wilson also cites to the trial court's jury instructions in support of her directed-verdict argument. Wilson contends that the instructions required the Commonwealth to prove, "beyond a reasonable doubt that 'she reported to the Kenton Dispatch Center in her 911 call that Carolyn Wilson threatened her with a firearm' and 'that she knew the information was false.'" Appellant brief, p. 17 (quoting R. at 79). Elsewhere, she contends the note sent out by the jury during deliberations established that "[t]he jury was confused whether 'the information' referenced in element B was the gun as stated in element A [.]" Appellant brief, p. 13.

Wilson's argument here is not fully formed. However, we are inclined to interpret Wilson's citation to the jury instructions and jury note as an assertion that the jury instructions were confusing and therefore insufficient. Any argument as to the sufficiency of the instructions appears unpreserved and Wilson has not requested palpable error review. Accordingly, such an argument is unavailing for the same reasons stated by our Supreme Court in *Johnson v. Commonwealth*, 680 S.W.3d 814, 823 (Ky. 2023):

> If there is a problem with the jury instructions, we decline to express an opinion on it now since Johnson has not requested palpable error review for the sufficiency of the instructions. *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008). Jury instructions and motions for directed verdict are distinct issues and "are reviewed differently[.]" *Smith v. Commonwealth*, 636 S.W.3d 421, 434 (Ky. 2021). "[T]he specific facts as described in the jury instructions have no bearing on our review of the trial court's ruling on a motion for directed verdict." *Id*.

*Id.*

The Commonwealth interprets Wilson's jury instruction argument as an attempt to narrow the standard of proof by which the trial court was required to review the directed verdict motions. And Wilson *does* contend that the instructions required the Commonwealth to establish that "'she reported to the Kenton Dispatch Center in her 911 call that Carolyn Wilson threatened her with a firearm' and 'that she knew the information was false.'" Appellant brief, p. 17 (quoting R. at 79).

-21-

It is true that "[t]he directed-verdict question is not controlled by the law as described in the jury instructions, but by the statutes creating the offense." *Smith*, 636 S.W.3d at 434. Upon Wilson's motions for directed verdict, the trial court was required to "compare the proof presented at trial with the *statutory elements* of" the crime of falsely reporting an incident. *Id.*

Accordingly, pursuant to the relevant language of KRS 519.040(1)(a), Wilson's arguments during her directed verdict motions required the trial court to assess whether the Commonwealth had presented sufficient proof that Wilson had "[k]nowingly cause[d] a false alarm of . . . emergency to be transmitted[.]" The directed verdict motions did not prompt the trial court to assess whether the Commonwealth had presented sufficient proof of the specific facts presented in the jury instructions of whether Wilson reported that Carolyn had "threatened her with a firearm" and "that she knew the information was false." R. at 79. "[T]he specific facts as described in the jury instructions have no bearing on our review of the trial court's ruling on a motion for directed verdict." *Johnson*, 680 S.W.3d at 823 (quoting *Smith*, 636 S.W.3d at 434).

The distinction is not one that is merely academic. Evidence which is not directly probative of the specific facts laid out by a jury instruction might be quite significant to a trial court when conducting a directed verdict analysis. In this case, the instruction directs the focus of the jury upon a single assertion Wilson

-22-

made during the 911 call: that Carolyn had threatened her with a gun. During the 911 call, after Wilson made this claim, she went on to complain to the operator that her sister and other family members were "getting away" and that the police were not arriving quickly enough. While a dispatcher might interpret this as an indication that the most immediate emergency had passed, Wilson went on to make the (admittedly false) assertions that she had previously gone to prison for killing and was willing to kill her family members.

Additionally, there appears to be no dispute on the record that Carolyn retired as a sergeant from her job with the Cincinnati Police Department, contrary to Wilson's claim in the 911 call that she had gotten her sister fired. Furthermore, the jury heard testimony of a responding officer that the allegation of a fired-police officer making threats served to heighten the urgency of the police response.

To prove a violation of KRS 519.040(1)(a), it must be established that "the false report results in an emergency response [.]" *Id.* As used in that statute an "emergency response" is "a response by two (2) or more first responders to a reported incident that . . . [i]s of such an emergent nature that the exemptions provided under KRS 189.940 would apply; and . . . [j]eopardizes or could jeopardize public safety[.]" KRS 519.010(2).

When assessing Wilson's directed verdict motions, while drawing all fair and reasonable inferences in favor of the Commonwealth from this evidence,

the trial court might have reasonably assessed these assertions as relevant evidence which might induce a reasonable juror to conclude that Wilson was guilty of knowingly causing a false alarm of emergency to be transmitted and that an emergency response occurred as a result. This is the case despite this evidence not being directly probative of the question detailed in the jury instructions of whether or not Wilson had truthfully reported that Carolyn had threatened her with a gun.

As pointed out in *Smith*, "a directed verdict may be inappropriate even though the jury instructions were flawed." 636 S.W.3d at 434; (internal quotation marks omitted). To the extent an argument otherwise is presented by Wilson, we agree with the Commonwealth that Kentucky law mandates that assessment of a directed verdict motion requires reference to the statutory elements of an offense to the exclusion of any specific facts in a jury instruction which "have no bearing on our review of the trial court's ruling on a motion for directed verdict." *Johnson*, 680 S.W.3d at 823 (quoting *Smith*, 636 S.W.3d at 434).

## CONCLUSION

For the foregoing reasons, Wilson's conviction is AFFIRMED.


ALL CONCUR.

BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Molly Mattingly                         Russell Coleman
Louisville, Kentucky                    Attorney General of Kentucky

                                        Joseph A. Beckett
                                        Assistant Attorney General
                                        Frankfort, Kentucky